**EDWARD SWANSTON and SYLVIA SWANSTON, Plaintiffs**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, Defendant**

Civil No. 311-1979

Territorial Court of the Virgin Islands

Div. of Christiansted at St. Croix

November 20, 1980

RICHARD DALEY, ESQ., Christiansted, St. Croix, V.I., *for plaintiffs*

CHARLES R. HUSBANDS, ESQ., Office of the Attorney General, Christiansted, St. Croix, V.I., *for defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

In this action brought under the Virgin Islands Tort Claims Act,[1] the plaintiffs seek to hold the Government liable for negligently executing its duties under pertinent provisions of the Virgin Islands Building Code.

On September 3, 1974, Edward and Sylvia Swanston purchased from Co-Build Companies, Inc. (formerly West Indies Enterprises, Inc.) a single-family home in the St. Croix residential development known as Strawberry. Thereafter their home suffered serious damage from cracking which occurred because the house did not rest on solid ground. The evidence showed that during construction of the foundation, the trench for the footing was dug too deep and loose fill was placed in the trench to build it back up to the proper depth. Concrete was poured into the trench to form the footing without first compacting the loose soil. When the soil settled, the foundation, roof and walls cracked.

The Government's involvement with construction of the house began on August 6, 1973, when West Indies Enterprises, Inc., applied for a building permit. An employee of the St. Croix Public Works Department reviewed the application and plans and issued the requested permit on August 31, 1973. During the course of construction, the Government's inspectors did not visit the property to verify conformance with the approved plans and compliance with

---

[1] 33 V.I.C. § 3408 et seq.

the Virgin Islands Building Code. Mr. Belardo, the inspector assigned to the Strawberry development testified that regular on-sight inspections were not made for the simple reason that they were not requested by the builder.

On completion of the construction, West Indies requested a final inspection of the house. On October 19, 1973, while acting within the scope of his employment, Mr. Belardo went to the premises, filled out a standard final building inspection report, and signed the report indicating that the house passed final inspection. On the basis of the report, the Public Works Department issued a certificate of use and occupancy on October 19, 1973. Although Mr. Belardo testified that he could not specifically recall conducting the final inspection of the house, he stated that it would be impossible to observe a building's structural components and the underlying soil once the building is complete. Thus it is clear, and I find as a fact, that when Mr. Belardo signed the final inspection report, he did not know whether or not the foundation conformed to Code requirements.

The Swanstons claim that the Government was negligent in its inspection of the premises and in its approval of the building for occupancy.

The Virgin Islands Building Code, 29 V.I.C. § 291 et seq. contains the following provisions:

§ 292. General purposes, application and scope

(a) The purposes of this chapter is to safeguard life and limb, property, and public welfare, through the establishment of minimum building requirements for structural strength and stability.

(b) Application.

(2) New Building-All new buildings and/or structures constructed after the effective date of this chapter shall be required to conform with its provisions.

§ 294. Permits.

(a) Permits, requirements for exceptions

(4) No building hereafter constructed, structurally altered, reconstructed, or enlarged in whole or part, shall be occupied or used until the Commissioner has made a final inspection thereof upon completion and has issued a Certificate of Use, stating the purpose for which the building or parts thereof may be used.

(c) Issuance of permits for use and occupancy. Upon completion of the work for which a building permit has been issued,

and certification to the Commissioner *that after inspection, the work performed under the permit conforms to the requirements of this chapter and other applicable laws,* the Commissioner shall issue a Certificate of Use and Occupancy. [Emphasis added.]

(1) No permit or Certificate of Use and Occupancy shall be issued for any building that is hereafter constructed, reconstructed, enlarged, altered, or moved, in whole or in part unless the building conforms to the provisions[2] of this chapter with respect to the proposed use. . . .

The statute empowers the Commissioner to enter and inspect any structure at all reasonable hours, 29 V.I.C. § 297.

■ The first issue presented is the nature of tort liability, if any, that results from the Government's failure to perform its statutory duties to inspect construction and to enforce standards established by the building code. With certain exceptions, the violation of a statute that establishes a standard of care is negligence, and liability results if proximate or legal causation is proved.[3]

■ Section 286 of the Restatement (Second) of Torts (1965) (herein, Restatement) provides the criteria for determining whether a statute supplies the standard of conduct of a reasonable man. This section of the Restatement provides:

The Court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment of an administrative regulation whose purpose is found to be exclusively or in part:

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

---

[2] See also 29 V.I.C. § 312.

[3] The concept of defining negligence by a statutory standard has been explained as follows:

" * * * Negligence is the breach of a legal duty. It is immaterial whether the duty is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, or is imposed by a statute designed for the protection of others. * * * The only difference is that in the one case, the measure of legal duty is to be determined upon common law principles, while in the other the statute fixes it, so that the violation of the statute constitutes conclusive evidence of negligence, or in other words, negligence per se. * * *
* * * All that the statute does is to establish a fixed standard by which the fact of negligence may be determined." Scott v. Independent School District No. 709, Duluth, 256 N.W.2d 188 (Minn. 1977).

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results . . .

The Government contends that plaintiffs are not members of the class of persons the provisions of the Code were designed to protect, as required by subpart (a). In support of this view, it cites several foreign jurisdiction cases. One case relied upon is Hoffert v. Owatonna Inn Towne Motel, Inc., 199 N.W.2d 158 (Minn. 1972). In Hoffert, the plaintiffs were guests in a motel that had been recently remodeled. The managers of the motel had submitted their proposal for improvements to the city of Owatonna. The city building inspector and engineer then inspected the motel and granted a building permit. The building inspector also inspected the motel during construction but failed to discover any building code violations. Two weeks after the final inspection, a fire broke out in the motel. The plaintiffs alleged they were trapped on the second floor because of improper stairway enclosures constructed in violation of the building code. The Court affirmed the dismissal of the complaint and the third-party complaint against the city stating:

* * * In order to recover against the city, appellants must show a breach of some duty owed them in their individual capacities and not merely a breach of some obligation owed the general public. Id. at 60.

The Court held that a building inspector acts exclusively for the benefit of the public and that an individual who is injured by the alleged negligent performance of a building inspector does not have a cause of action. The public duty doctrine articulated in Hoffert has been applied by courts in a number of jurisdictions to shield a sovereign from liability for negligent inspection.[4]

Other courts, however, have found a duty owing to individual plaintiffs in similar circumstances. In Campbell v. City of Bellvue, 530 P.2d 234 (Wash. 1975), plaintiff's neighbor had installed an underwater lighting system in a creek that ran through his prop-

---

[4] Exceptions to the application of the doctrine, however, have been recognized in jurisdictions where the doctrine is viable. Courts have sometimes held it inapplicable where a plaintiff has distinguished himself from other members of the public. These cases usually involve some sort of contract between the government entity and the plaintiff which induces detrimental reliance on the part of the individual. See, e.g., Sumllen v. City of New York, 268 N.E.2d 763 (N.Y. 1971).

erty. A city electrical inspector discovered that the wiring was defective and notified the homeowner that it constituted a "threat to life." The inspector, however, did not disconnect the hazardous wiring as required by municipal ordinance and plaintiff subsequently fell into the creek and was electrocuted. The Court held that the inspector's breach of the duty imposed on him by the ordinance resulted in the city's liability to plaintiff.

> In the instant case, the City's electrical inspector was alerted to and knew of the nonconforming underwater lighting system and of the extreme danger created thereby to neighboring residents in proximity to the stream in question. Yet, the inspector failed to comply with the City's ordinance * * * directing that he sever or disconnect the lighting system until it was brought into compliance with electrical code requirements. *These requirements were not only designed for protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved, a category into which the plaintiff and his neighbors readily fall.* 530 P.2d at 241. (Emphasis added.)

A duty was also found in Adams v. State, 555 P.2d 235 (Alas. 1976) in which the plaintiffs sued the State of Alaska for injuries sustained in a hotel fire in Anchorage. The State admitted its negligent failure to abate known fire hazards in the hotel which had been discovered by State inspectors 8 months before the fire. The Court did not reach the question whether the State had the statutory duty to enforce compliance with the fire safety statutes and rules in effect. Instead, it held under common law principles that the State having undertaken to inspect the building was under duty to exercise reasonable care in conducting the inspections. It was necessary, nevertheless, for the Court to define the class to which the common law duty was owed. It held that the duty ran to the plaintiffs who were the users of the hotel and "the intended beneficiaries of the inspection services provided and the foreseeable victims of the fire hazards left uncorrected." 555 P.2d at 241.

The Court found the public duty doctrine inapplicable for two reasons:

"First, the common law duty which we discuss * * * is not alone owed to the general public, nor is it expressly based upon the mandates of the fire inspection statutes. The duty is a limited one, and its beneficiaries a limited class. In undertaking to inspect and advise on the conditions in The Gold Rush [Hotel], the State under-

took a duty to those injured by the burning of the hotel, not to the public in general.

"Second, we consider that the 'duty to all, duty to no one' doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. An application of the public duty doctrine here would result in finding no duty owed the plaintiffs or their decedents by the State, because, although they were foreseeable victims and a private defendant would have owed such a duty, no 'special relationship' between the parties existed. Why should the establishment of duty become more difficult when the State is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not." 555 P.2d at 241.

Another pertinent case is Lorshbough v. Township of Buzzle, 258 N.W.2d 96 (Minn. 1977). There a fire began to burn in the township dump. The following day the township took steps to contain and monitor the fire. Even though the fire continued to smoulder, additional garbage was dumped at the facility. Wind conditions subsequently occurred which permitted the fire to spread. The forest fire that ensued destroyed real and personal property belonging to plaintiffs who lived nearby. During his inspection some 21 months before the fire, the county inspector had become aware that the Buzzle dump did not conform to applicable statutes and regulations but had not taken immediate steps to enforce compliance as he was required by statute to do. Holding that plaintiffs belonged to the class of persons the legislature intended to protect by enacting the statute and regulations, the court stated:

> It may be possible to distinguish the recent cases finding a governmental duty owing to individual plaintiffs, but such distinctions are too fine to persuade us to reject the principle derived from those cases. *The principle is that a governmental unit owes a particular individual a duty of care when its officers or agent, in a position and with authority to act, has or should have had knowledge of a condition that violated safety standards prescribed by statute or regulation, and that presents a risk of serious harm to the individual or his property. When such injury is reasonably foreseeable, the governmental unit has a duty to exercise reasonable care for the individual's safety.* Id. at 102. (Emphasis added.)

165

Although a duty owing to individuals has most frequently been found where the government had actual knowledge of a dangerous condition but failed to abate the condition, apparently at least one court has recognized the possibility of a duty to individual plaintiffs where knowledge on the part of the government was not claimed. In Wilson v. Nepstad, 282 N.W.2d 664 (Iowa 1979) occupants of an apartment building brought an action against the city of Des Moines and the owners of the apartment building for injuries and deaths resulting from a fire. The trial court dismissed the municipal tort claim action. On appeal the Supreme Court of Iowa held that it could not be determined, as a matter of law on motions to dismiss, that the plaintiffs' petition failed to state a cause of action on the theory that the city breached statutory duties relating to building and fire inspection because the city owed no duty to occupants of the apartment building.

In light of the foregoing authorities, I think the public duty doctrine should not be applied in this case to prevent the Swanstons from recovering. The reasons for my decision are two-fold. First, the present case is closer factually to Campbell, Adams and Lorshbough than to Hoffert. Although the government's inspector did not have actual knowledge of a dangerous condition as did the inspectors in the Campbell, Adams, and Lorshbough, he did more than the inspector in Hoffert who merely failed to perceive a violation. Here the inspector approved the final inspection of the building after visiting the premises where he did not so much as undertake to look for structural defects. Second, the trend in this area of the law is toward liability. Even in jurisdictions where it was once relied upon, the public duty doctrine is losing support. Modlin has not survived the Florida legislature's recent abrogation of governmental immunity. See Department of Health & Rehabilitative Services v. McDougall, 395 So.2d 528, 532 (Fla. App. 1978). Georges has been eroded by Halvorson v. Dahl, 574 P.2d 1190, 1192 (Wash. 1978) ("Liability can be founded upon a municipal code, if that code by its terms evidences a clear intent to identify and protect a particular and circumscribed class of persons.") And the government's principle case, Hoffert, has been seriously undermined by Lorshbough.

■ I adopt the rule articulated in Lorshbough as the rule of law of the present case. Applying that rule, I find that the government had a duty to exercise reasonable care for the Swanstons. Its inspector, having approved the subject building, is chargeable with knowledge of a structural condition that undoubtedly posed risk of

serious harm. In the absence of appropriate inspections, he should not have approved the building.[5]

■ As to subparts (b), (c), and (d) of § 286 of the Restatement, the Code provisions were promulgated "to safeguard life and limb, *property*, and public welfare, through the establishment of minimum building requirements for structural strength and stability." 29 V.I.C. § 292(a). (Emphasis added.) A reading of this provision indicates that the legislature clearly intended the government's duty to encompass the risk of property damage against injury from structural deficiencies such as the one presented in this case.

All the requirements of § 286 of the Restatement having been met, I hold that the Code supplies the standard of conduct of a reasonable man and that the government's violation of the Code constituted negligence per se. The government has not presented sufficient evidence to overcome the presumption of negligence, and accordingly I find negligence on its part.

■ To hold the Government liable, its conduct, however, must still be a legal cause of the harm to the plaintiffs. The injuries suffered by the Swanstons were closely connected with the Government's conduct since the Government had the ability to enforce compliance with the Code but failed to properly do so. The Government's duty to plaintiffs was to exercise reasonable care to protect them from seriously defective construction. Had the Government exercised reasonable care in its inspection and enforcement duties, it would have discovered the defect or, if the defect was not discoverable because of the stage of completion, would have refused to approve the construction.

Since the Government's conduct was a substantial factor in bringing about the harm to the plaintiff and since the harm would not have occurred but for the Government's negligence, I find legal causation.

■ Before discussing the question of damages, one final point must be addressed. In its post trial memorandum of law, the Government seems to assert that building inspection is a discretionary function and, as such, is an activity for which the Government is not liable. The Government misinterprets the law. The discretionary-ministerial distinction for tort liability which exists in the Virgin Islands results from the common law doctrine which states that

---

[5] Since this case is not one of failing to act at all, I express no opinion on the scope of government duty in such a case.

167

governmental officials are subject to tort liability for negligence in the performance of their ministerial, but not their discretionary acts. Under the common law, the discretionary-ministerial distinction is not used for determining tort liability of the governmental entity. §§ 95B and 895(c) of the Restatement.

Having determined the liability of the defendant, I must turn to the question of damages. There is no doubt that the dwelling situated on the subject premises has been functionally destroyed. The defendant, through its then Commissioner of Public Works, by a letter dated January 25, 1979 and addressed to Mr. Swanston, advised that "this is an official condemnation notice and declared the home "beyond reasonable repair." Plaintiffs' evidence supports the conclusion that the home is beyond reasonable repair and is uninhabitable.

■■ Although there is no hard and fast rule governing the recovery of damages in cases in which a building is destroyed, courts usually measure damages by (1) the decrease in market value of the land immediately before and after the injury; or (2) the cost of replacing the building to its condition immediately prior to the injury; or (3) the reasonable value of the building at the time of its destruction. The Court should adopt the method which will most accurately compensate the particular plaintiffs. 22 Am.Jur.2d Damages § 138.

Evidence of the value of the land and improvements which are the subject matter of this litigation was introduced through the following exhibits:

1—Plaintiffs' Exhibit #28, a tax bill for the year 1975.
2—Plaintiffs' Exhibit #18, a series of 3 receipts for cash down payment totalling $4450.00.
3—Plaintiffs' Exhibit #19, a loan "closing statement," and
4—Plaintiffs' Exhibit #17, a "statement of cost of mortgage loan."

■ A careful evaluation of the contents of the 1975 tax bill establishes an assessed valuation of $2,582 for land and $20,455 for improvements. By Act No. 3813 (effective June 9, 1976), the Tax Assessor was required to "calculate the value of real property for tax assessment purposes at a rate of 60% of actual value for the 1975 assessment." Thus we can mathematically compute the actual value of the land and improvements as determined at that time by the tax assessor to have been $38,395 and the value of the improvements

168

alone to have been $34,091. The addition of the down payment of $4,450 to the mortgage loan of $28,050, as evidenced by plaintiffs' exhibits numbered 17 and 19, disclosed a purchase price for land and building of $32,500 and this computation is corroborated by the recitation in plaintiffs' exhibits numbered 17 and 19 of the charge for tax stamps, namely $325. The provisions of 33 V.I.C. § 123(1) allows computation of a total purchase price of $32,500 when the 1% rate is applied.

Since no other competent and credible evidence has been adduced by either party to establish market value, nor has any evidence of a contradictory nature been offered, I find as a fact that the true market value of the destroyed building here in issue is not more than $34,091 nor less than $29,250.

All of the foregoing calculations are academic, however, since the value of the improvements exceeds $25,000. No judgment in excess of that sum may be entered against the Government. 33 V.I.C. § 3411(e). In accordance with the dictates of Baptiste v. Government of the Virgin Islands, 12 V.I. 607 (C.A. 3d 1976) plaintiffs are entitled to recover, therefore, only the sum of $25,000 including costs and attorney's fees.